IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

---

UNITED STATES OF AMERICA,    )
    )
         Plaintiff,    )
    )      Civil Action No.  1:21-cv-182-H
         v.    )
    )      Judge Hendrix
WTG GAS PROCESSING, L.P., WTG    )
SOUTH PERMIAN MIDSTREAM LLC,)
and DAVIS GAS PROCESSING, INC.,    )
    )
         Defendants.    )

---

**CONSENT DECREE**

## TABLE OF CONTENTS

I.       JURISDICTION AND VENUE ...................................................................................... 3

II.      APPLICABILITY ......................................................................................................... 4

III.     OBJECTIVES ............................................................................................................... 6

IV.      DEFINITIONS .............................................................................................................. 6

V.       CIVIL PENALTY .......................................................................................................... 9

VI.      COMPLIANCE REQUIREMENTS ............................................................................ 10

VII.     REVIEW OF DELIVERABLES ................................................................................. 32

VIII.    PERMITS .................................................................................................................... 32

IX.      REPORTING REQUIREMENTS ............................................................................... 32

X.       STIPULATED PENALTIES ....................................................................................... 35

XI.      FORCE MAJEURE ..................................................................................................... 38

XII.     DISPUTE RESOLUTION ........................................................................................... 40

XIII.    INFORMATION COLLECTION AND RETENTION ............................................... 43

XIV.     EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS .................................... 45

XV.      COSTS ......................................................................................................................... 46

XVI.     NOTICES .................................................................................................................... 46

XVII.    EFFECTIVE DATE ..................................................................................................... 49

XVIII.   RETENTION OF JURISDICTION ............................................................................. 49

XIX.     MODIFICATION ........................................................................................................ 49

XX.      TERMINATION .......................................................................................................... 49

XXI.     PUBLIC PARTICIPATION ........................................................................................ 50

XXII.    SIGNATORIES/SERVICE ......................................................................................... 51

XXIII.   INTEGRATION .......................................................................................................... 51

XXIV.    FINAL JUDGMENT ................................................................................................... 52

XXV.     26 U.S.C. SECTION 162(F)(2)(A)(II) IDENTIFICATION ........................................ 52

XXVI.    APPENDICES ............................................................................................................. 52

Concurrently with the lodging of this Consent Decree, Plaintiff, the United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), has filed a Complaint in this action seeking injunctive relief and civil penalties from the Defendants.  The Complaint alleges that the Defendants violated the "General Duty Clause" in Clean Air Act Section 112(r)(1), 42 U.S.C. § 7412(r)(1), the "Risk Management Program" of Clean Air Act Section 112(r)(7), 42 U.S.C. § 7412(r)(7), and the implementing "Chemical Accident Prevention Regulations" (promulgated at 40 C.F.R. Part 68) at four of the Defendants' natural gas processing plants in Texas.  These four facilities include the Defendants' East Vealmoor Gas Plant (in Coahoma, Texas), the Benedum Gas Plant (in Midkiff, Texas), the Shackelford Gas Plant (in Cisco, Texas), and the Big Lake Treatment Plant (in Big Lake, Texas).

The violations alleged in the Complaint stem from inspections that the EPA conducted at these four facilities between 2016 and 2018.  The EPA inspected these facilities to determine their compliance with Clean Air Act Section 112(r), 42 U.S.C. § 7412(r), and the Chemical Accident Prevention Regulations following accidental releases of regulated toxic and flammable substances at the East Vealmoor Gas Plant on November 1, 2015 and the Big Lake Treatment Plant on April 14, 2018.

The Big Lake, Texas Treatment Plant is no longer in operation and was demolished as of April 1, 2021.  The Shackelford Gas Plant was sold on February 12, 2021 to an entity that is not affiliated with West Texas Gas, Inc. or any of its subsidiaries.

The Defendants have determined that the Denton Gas Plant will permanently cease operations by no later than March 1, 2022 and the East Vealmoor Gas Plant will permanently cease operations by no later than June 30, 2023.

As of October 4, 2021, after the filing of the Complaint in this action, WTG Gas

1

Processing, LLC, a Texas limited liability company, effectuated a merger with Defendant WTG Gas Processing, L.P. pursuant to the Texas Business Organizations Code.  As part of that merger, WTG Gas Processing, LLC became the owner and operator of the East Vealmoor Gas Plant, and WTG Gas Processing, LLC assumed and succeeded to Defendant WTG Gas Processing, L.P.'s obligations under this Consent Decree.  Both WTG Gas Processing, LLC and WTG Gas Processing, L.P. survived the merger.

WTG Gas Processing, LLC, WTG Jameson, L.P., and WTG North Permian Midstream LLC are not parties to the Complaint, but the Defendants and the non-Defendant parties to this Consent Decree (WTG Gas Processing, LLC, WTG Jameson, L.P., and WTG North Permian Midstream LLC) jointly enter into this Consent Decree as settling parties (collectively, the "Settling Parties") and agree to be bound by this Consent Decree's terms and obligations.  WTG Jameson, L.P. operates a natural gas processing plant located in the City of Silver, Coke County, Texas (the "Jameson Gas Plant").  WTG North Permian Midstream LLC operates two natural gas processing plants located near the City of Stanton, Martin County, Texas (the "Martin County Gas Plant" and the "Sale Ranch Gas Plant").

Prior to the lodging of this Consent Decree, the Settling Parties commenced implementation of corrective measures at their Covered Natural Gas Processing Plants in order to ensure compliance with Clean Air Act Section 112(r)(1) and the Chemical Accident Prevention Regulations, and in order to protect public health, welfare, and the environment. These corrective measures include developing and implementing an Environmental Management System ("EMS") for the Settling Parties and the Covered Natural Gas Processing Plants.

As more specifically described in Section VI (Compliance Requirements), the Settling Parties commit to undertake additional compliance projects that are intended to prevent the

2

accidental release of extremely hazardous substances and regulated substances from the Covered Natural Gas Processing Plants, as well as to have measures in place and available to minimize the consequences of any accidental releases from the Covered Natural Gas Processing Plants.

The United States anticipates that the Consent Decree's compliance requirements, which are subject to a reasonable timetable for implementation, will result in the cessation of the violations that are alleged in the Complaint and resolved through Section XIV (Effect of Settlement/Reservation of Rights) of the Consent Decree.

Neither the Defendants nor any of the Settling Parties admit any liability arising out of the transactions or occurrences alleged in the Complaint.

The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation among the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I (Jurisdiction and Venue), and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.   <u>JURISDICTION AND VENUE</u>

1.      This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Clean Air Act Section 113(b), 42 U.S.C. § 7413(b), and over the Parties.  This Court has jurisdiction over WTG Jameson, L.P. and WTG North Permian Midstream LLC, as well as over their obligations in this Consent Decree, pursuant to the All Writs Act, 28 U.S.C. § 1651, and Fed. R. Civ. Proc. 19(a).

2.      Venue lies in this District pursuant to Clean Air Act Section 113(b), 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and (c) and 1395(a), because violations alleged in the Complaint are alleged to have occurred in this judicial district and the Defendants reside and conduct business in this judicial district.  The Settling Parties consent to: a) this Court's subject matter jurisdiction over this Consent Decree and any action to enforce this Consent Decree, b) this Court's personal jurisdiction over them, and c) venue in this judicial district.

3.      For purposes of this Consent Decree, the Defendants agree that the Complaint states claims upon which relief may be granted pursuant to Clean Air Act Sections 112(r) and 113(b), 42 U.S.C. §§ 7412(r) and 7413(b).

4.      Notice of the commencement of this action has been given to the Texas Commission on Environmental Quality ("TCEQ") and New Mexico Environment Department in accordance with Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b).

## II.      APPLICABILITY

5.      The obligations of this Consent Decree apply to and are binding upon the United States, and upon the Settling Parties and any successors, assigns, or other entities or persons otherwise bound by law.

6.      No transfer of ownership or operation of any of the Covered Natural Gas Processing Plants, whether in compliance with the procedures of this Paragraph or otherwise, will relieve any of the Settling Parties of their obligation to ensure that the terms of the Consent Decree are implemented, unless: (a) the transferee agrees to undertake the obligations required by this Decree and to be substituted for the Applicable Settling Party under the Decree and to be bound by its terms and (b) the United States consents in writing to a Consent Decree modification that terminates the Applicable Settling Party's obligations under the Consent

4

Decree.  If the Applicable Settling Party is a Defendant, the transferee must agree to be substituted as a Defendant under the Consent Decree.

7.     At least 30 Days before any such transfer, the Applicable Settling Party must provide a copy of this Consent Decree to the proposed transferee and must simultaneously provide written notice of the prospective transfer, together with a copy of the proposed written agreement (which may have "Confidential Business Information" designated as such in accordance with 40 C.F.R. Part 2), to the EPA, the United States, and the United States Attorney for the Northern District of Texas in accordance with Section XVI (Notices).  Any attempt to transfer ownership or operation of any Covered Natural Gas Processing Plant without complying with this Paragraph constitutes a violation of this Consent Decree.

8.     If an Applicable Settling Party does not secure the United States' consent to a Consent Decree modification that terminates the Applicable Settling Party's obligations under the Consent Decree within a reasonable period of time (but no sooner than 60 Days) after submitting the notice and information required by the previous Paragraph, then the Applicable Settling Party and the transferee may file a motion requesting the Court to approve a modification substituting the transferee for the Defendant and/or Applicable Settling Party responsible for complying with the terms and conditions of the Consent Decree that the transferee intends to assume.  The United States may file an opposition to the motion.  The motion to modify the Consent Decree shall be granted unless the Applicable Settling Party and the transferee: (i) fail to show that the transferee has the financial and technical ability to assume the ongoing compliance requirements and obligations of the Consent Decree; (ii) fail to show that the modification language effectively transfers the ongoing compliance requirements and obligations to the transferee; or (iii) the Court finds other good cause for denying the motion.

9.      The Settling Parties must provide a copy of this Consent Decree to all officers, employees, and agents whose duties reasonably include ensuring compliance with any provision of this Consent Decree, as well as to any contractor retained to perform work required under this Consent Decree.  The Settling Parties must condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

10.     In any action to enforce this Consent Decree, the Settling Parties will not raise as a defense the failure by any of their officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### III.    OBJECTIVES

11.     The Parties enter into this Consent Decree with the objectives of advancing the Settling Parties' compliance with Clean Air Act Section 112(r), 42 U.S.C. § 7412(r), and the Chemical Accident Prevention Regulations, as well as preventing the accidental release of extremely hazardous substances and regulated substances from the Covered Natural Gas Processing Plants.

### IV.    DEFINITIONS

12.     Terms used in this Consent Decree that are defined in the Clean Air Act or in regulations promulgated pursuant to the Clean Air Act have the meanings assigned to them in the Clean Air Act or such regulations, unless otherwise provided in this Consent Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions apply:

      a.      "Applicable Settling Party" or "Applicable Settling Parties" means, for:

           i.      The Benedum Gas Plant and Complex: WTG South Permian Midstream LLC;

           ii.     The Denton Gas Plant: Davis Gas Processing, Inc.;

           iii.    The East Vealmoor Gas Plant: WTG Gas Processing, LLC;

iv.   The Jameson Gas Plant: WTG Jameson, L.P.;

v.   The Martin County Gas Plant: WTG North Permian Midstream LLC;

vi.   The Saint Lawrence Gas Plant: WTG South Permian Midstream LLC;

vii.   The Sale Ranch Gas Plant: WTG North Permian Midstream LLC; and

viii.   The Sonora Gas Plant: WTG South Permian Midstream LLC.

b.   "Complaint" means the complaint filed by the United States in this action.

c.   "Consent Decree" means this Consent Decree and all appendices attached hereto (listed in Section XXVI).

d.   "Covered Natural Gas Processing Plants" means one or more of the following:

(1)   The Benedum Gas Plant and Complex located near the City of Midkiff, Upton County, Texas, which is owned and operated by WTG South Permian Midstream LLC.

(2)   The Denton Gas Plant located near the City of Lovington, Lea County, New Mexico, which is owned and operated by Davis Gas Processing, Inc.  The Denton Gas Plant shall permanently cease operations no later than March 1, 2022.

(3)   The East Vealmoor Gas Plant located near the City of Coahoma, Howard County, Texas, which is owned and operated by WTG Gas Processing, LLC.  The East Vealmoor Gas Plant shall permanently cease operations no later than June 30, 2023.

(4)   The Jameson Gas Plant located near the City of Silver, Coke County, Texas, which is owned and operated WTG Jameson, L.P.

(5)   The Martin County Gas Plant located near the City of Stanton, Martin County, Texas, which is owned and operated by WTG North Permian Midstream LLC.

(6)   The Saint Lawrence Gas Plant located near the City of St. Lawrence, Glasscock County, Texas, which is owned and operated by WTG South Permian Midstream LLC.

(7)   The Sale Ranch Gas Plant located near the City of Stanton, Martin

County, Texas, which is owned and operated by WTG North Permian Midstream LLC.

(8)   The Sonora Gas Plant located near the City of Midkiff, Upton County, Texas, which is owned and operated by WTG South Permian Midstream LLC.

e.     "Date of Lodging" means the date this Consent Decree is filed for lodging with the Clerk of the Court for the United States District Court for the Northern District of Texas;

f.      "Day" means a calendar day unless expressly stated to be a business day. In computing any period of time for a deadline under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period runs until the close of business of the next business day.

g.     "Defendants" mean WTG Gas Processing, L.P., WTG South Permian Midstream LLC, and Davis Gas Processing, Inc.

h.     "DOJ" means the United States Department of Justice and any of its successor departments or agencies.

i.      "Environmental Management System" or "EMS" means the integrated environmental compliance system created by the Settling Parties to standardize and formalize practices and programs used to maintain, track, and improve the Settling Parties' Environmental Performance and compliance with Environmental Requirements.

j.      "EPA" means the United States Environmental Protection Agency and any of its successor departments or agencies.

k.     "Effective Date" means the definition provided in Section XVII.

l.      "Interest" means interest at the rate specified pursuant to 28 U.S.C. § 1961.

m.    "ISO" means the International Organization for Standardization.

n.     "Paragraph" means a portion of this Decree identified by an arabic numeral.

o.     "Parties" means the United States and the Settling Parties.

p.     "Risk Management Plan" means, as defined in 40 C.F.R. § 68.3, the risk management plan required by 40 C.F.R. Part 68, Subpart G.

q.     "Risk Management Program" means the set of accident prevention

regulations required by 42 U.S.C. § 7142(r)(7) and specified in:

    (1)  40 C.F.R. § 68.12(b) (for "Program 1" facilities);

    (2)  40 C.F.R. § 68.12(c) and 40 C.F.R. Part 68, Subpart C (for "Program 2" facilities); and

    (3)  40 C.F.R. § 68.12(d) and 40 C.F.R. Part 68, Subpart D (for "Program 3" facilities).

r.    "Section" means a portion of this Decree identified by a roman numeral.

s.    "Settling Parties" means the Defendants, as well as WTG Gas Processing, LLC, WTG North Permian Midstream LLC, and WTG Jameson, L.P.

t.    "Title V Operating Permit" means a permit issued in accordance with Subchapter V of the Clean Air Act, 42 U.S.C. §§ 7661-7661f, and the regulations promulgated at 40 C.F.R. Part 70 (or the equivalent federally enforceable state regulations).

u.    "United States" means the United States of America, acting on behalf of EPA.

## V.    CIVIL PENALTY

13.    By no later than 30 Days after the Effective Date, the Defendants must pay the sum of $ 3,125,000 as a civil penalty, together with Interest accruing from the Date of Lodging, at the rate specified in 28 U.S.C. § 1961 as of the Date of Lodging.

14.    The Defendants must pay the civil penalty due by FedWire Electronic Funds Transfer ("EFT") to the DOJ account, in accordance with instructions provided to Defendant by the Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Northern District of Texas after the Effective Date.  The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which the Defendants must use to identify all payments required to be made in accordance with this Consent Decree.  The FLU will provide the payment instructions to:

    Mr. Richard Hatchett
    Executive Vice President
    WTG Gas Processing, L.P.

211 N. Colorado Street
Midland, TX 79701
Email: RHatchett@westtexasgas.com
Office Telephone: (432) 682-6311

on behalf of the Defendants.  The Defendants may change the individual to receive payment instructions on its behalf by providing written notice of such change to DOJ and EPA in accordance with Section XVI (Notices).

15.     At the time of payment, the Defendants must send notice that payment has been made to: (i) the EPA via email at: cinwd_acctsreceivable@epa.gov and via regular mail to: EPA Cincinnati Finance Office, 26 W. Martin Luther King Drive, Cincinnati, Ohio 45268; and (ii) the DOJ via email or regular mail in accordance with Section XVI (Notices); and (iii) the EPA in accordance with Section XVI (Notices).  This notice must state that the payment is for the civil penalty owed pursuant to the Consent Decree in *United States v. WTG Gas Processing, L.P., et al.* and must reference the civil action number, CDCS Number and DOJ case number 90-5-2-1-12232.

16.     The Defendants must not deduct any penalties paid under this Consent Decree pursuant to this Section or Section X (Stipulated Penalties) in calculating their federal, state, and local income taxes.

## VI.     COMPLIANCE REQUIREMENTS

17.     Written deliverables required by sub-Sections VI.D and VI.E may be designated as subject to "EPA Comment."  For deliverables subject to EPA Comment, the EPA may provide written comments in accordance with Paragraph 48 of Section VII (Review of Deliverables). Sub-Section VI.C provides for a review process in lieu of Section VII (Review of Deliverables) regarding how the EPA will respond to the Settling Parties' Third Party Candidates.

10

**A.  Permanent Shutdown and Retirement of Denton Gas Plant and East Vealmoor Gas Plant.**

18.     By no later than March 1, 2022, the Applicable Settling Party must permanently cease operating the Denton Gas Plant and surrender the plant's Title V Operating Permit(s) to the applicable air permitting authority for the State of New Mexico.  By no later than June 30, 2023, the Applicable Settling Party must permanently cease operating the East Vealmoor Gas Plant and surrender the plant's Title V Operating Permit(s) to the TCEQ.  Upon permanently ceasing operations at each of these plants, the Applicable Settling Party must promptly complete decommissioning of these plants.  Except as specified in the Consent Decree, the Denton Gas Plant and the East Vealmoor Gas Plant are subject to all requirements of this Consent Decree until each plant permanently ceases operating and surrenders its Title V Operating Permit in accordance with the requirements of this Paragraph.  After each plant permanently ceases operating and surrenders its existing Title V Operating Permit(s), nothing in this Consent Decree prevents the Defendants from obtaining a new Title V Operating Permit in accordance with applicable law for a newly constructed facility at the same site as the decommissioned former plant.

**B.  RMP Applicability at Covered Natural Gas Processing Plants.**

19.     For each Covered Natural Gas Processing Plant, the Settling Parties must:

a.      Comply with 40 C.F.R. § 68.215;

b.      Accept that 40 C.F.R. Part 68 is an applicable requirement for each Covered Natural Gas Processing Plant and include 40 C.F.R. Part 68 as an applicable requirement in each plant's Title V Operating Permit(s), except to the extent that: (i) the plant does not have a Title V Operating Permit or (ii) any such permits already have terms incorporating 40 C.F.R. Part 68 as an applicable

11

requirement.

c.      Comply with the 40 C.F.R. Part 68 requirements for the applicable

"program level" at each Covered Natural Gas Processing Plant.

20.      The Settling Parties must comply with the requirements of Section VI.B by the

Effective Date.

**C.  Selection of Third Party Candidates to Assist Settling Parties.**

21.      This sub-Section contains the requirements for how the Settling Parties must

select proposed candidates ("Third Party Candidate(s)") to be the EMS Auditor(s) and RMP

Auditor(s) that are required in sub-Sections VI.D and VI.E.  General qualifications that all Third

Party Candidates must meet are listed below in Paragraphs 22-23.  Specific qualifications for

each type of Third Party Candidates are listed below in Paragraph 24 (for the EMS Auditor(s))

and Paragraph 25 (for the RMP Auditor(s)).  This sub-Section also provides for how, in lieu of

the process in Section VII (Review of Deliverables), the EPA will respond to the Settling Parties'

proposed Third Party Candidates.

22.      By no later than the respective deadlines specified in Paragraph 33 (for the EMS

Auditor) and Paragraph 38 (for the RMP Auditor), the Settling Parties must submit to the EPA

the name, any corporate affiliation, address, and qualifications of at least one Third Party

Candidate for each role.  The Settling Parties must certify the following "Requirements of

Independence" for each Third Party Candidate:

        a.   Each Third Party Candidate and its personnel have not conducted research,
development, design, construction, engineering, consulting, or other advisory
services for the Settling Parties within two years of the Date of Lodging.
However, a Third Party Candidate with personnel who, before working for the
Third Party Candidate, conducted research, development, design,
construction, or consulting services for the Settling Parties (as an employee or
contractor) may meet the Requirements of Independence by ensuring that
these personnel do not participate on, manage, or advise the Third Party

12

Candidate with respect to any obligations under the Consent Decree that the Third Party Candidate is selected to perform.  For each Third Party Candidate, the Settling Parties must provide descriptions of any previous work contracts, or financial relationship that the Third Party Candidate has had with any of the Settling Parties.

b.   Each Third Party Candidate was not involved in developing or implementing the Settling Parties' programs and procedures for complying with Clean Air Act Section 112(r), 42 U.S.C. § 7412(r), the Chemical Accident Prevention Regulations, or process safety management requirements under other applicable federal, state, or local laws.

c.   Each Third Party Candidate was not involved in developing or implementing the Settling Parties' EMS or EMS Manual.

d.   Each Third Party Candidate and its personnel will not provide any other commercial, business or voluntary services to the Settling Parties for a period of at least two years after completing any obligations under the Consent Decree that the Third Party Candidate is selected to perform, unless otherwise agreed to by the United States.

e.   The Settling Parties will not provide future employment to any of the Third Party Candidate's personnel who manage, conduct, or otherwise participate in any obligations under the Consent Decree that the Third Party Candidate is selected to perform for a period of at least two years after completing those obligations, unless otherwise agreed to by the United States.

f.   Each Third Party Candidate and its personnel shall receive no compensation or financial benefit based on the outcome of any obligation under the Consent Decree that the Third Party Candidate is selected to perform, except for payment for performing the required obligations.

23.   The Settling Parties must bear all expenses of selecting each Third Party Candidate and retaining the chosen candidates as the EMS Auditor(s) and RMP Auditor(s).  The Settling Parties must certify that the chosen EMS Auditor(s) and RMP Auditor(s) will act independently and objectively when performing all activities related to this Consent Decree.  The Settling Parties must provide the chosen EMS Auditor(s) and RMP Auditor(s) with a copy of this Consent Decree and all appendices, as well as grant them access to the Covered Natural Gas Processing Plants, and must provide or otherwise make available any necessary personnel,

documents, and health and safety training to fully perform all activities required by this Consent Decree.

24.   <u>Qualifications of the EMS Auditor(s)</u>.   By no later than the deadline specified in Paragraph 33, the Settling Parties must submit a written proposal to the EPA for at least one Third Party Candidate to be the EMS Auditor.  The Settling Parties' written proposals must certify and include information demonstrating that:

> a.   Each Third Party Candidate satisfies the EMS auditor qualifications under ISO 19011:2018 (Third edition) and has experience in developing and implementing an EMS in accordance with ISO 14001:2015.
>
> b.   Each member of the Third Party Candidate's team that will perform any obligation under the Consent Decree has a working process knowledge of stationary sources classified under North American Industrial Classification System (NAICS) code 211130 (formerly NAICS code 211112) and Standard Industrial Classification (SIC) code 1321.
>
> c.   Each member of the Third Party Candidate's team that will perform any obligation under the Consent Decree has a working knowledge of the Environmental Requirements that apply to the Covered Natural Gas Processing Plants, including, not limited to, Clean Air Act Section 112(r), 42 U.S.C. § 7412(r), and the Chemical Accident Prevention Regulations.
>
> d.   Each member of the Third Party Candidate's team that will perform any obligation under the Consent Decree has at least a bachelor's degree from an accredited institution.

25.   <u>Qualifications of the RMP Auditor</u>.   By no later than the deadline specified in Paragraph 38, the Settling Parties must submit a written proposal to the EPA for at least one Third Party Candidate to be the RMP Auditor.  The Settling Parties' written proposal must certify and include information proving that:

> a.   Each member of the Third Party Candidate's team that will perform any obligation under the Consent Decree has a working process knowledge of stationary sources classified under North American Industrial Classification System (NAICS) code 211130 (formerly NAICS code 211112) and Standard Industrial Classification (SIC) code 1321, as well as of recognized and generally accepted good engineering practices for these types of natural gas

14

facilities.

b. Each member of the Third Party Candidate's team that will perform any obligation  under the Consent Decree has a working knowledge of Clean Air Act Section 112(r), 42 U.S.C. § 7412(r), the Chemical Accident Prevention Regulations, and applicable process safety management requirements under federal, state, and local laws.

c. Each Third Party Candidate has at least 10 years of experience conducting audits regarding compliance with Clean Air Act Section 112(r), the Chemical Accident Prevention Regulations, and process safety management.

d. Each member of the Third Party Candidate's team that will perform any obligation under the Consent Decree has been trained on the proper standards and techniques for auditing compliance with Clean Air Act Section 112(r), the Chemical Accident Prevention Regulations, and process safety management.

26.     EPA Review of Third Party Candidates.  The EPA will notify the Settling Parties,

in writing, whether it approves or disapproves of a Third Party Candidate or whether the EPA

needs more information.   The EPA may disapprove any Third Party Candidate if such candidate

does not meet the criteria set forth in this Consent Decree, and the EPA's decision to approve or

disapprove any such candidate is not subject to judicial review.  If the Settling Parties have

proposed only one Third Party Candidate to be one of the required auditors, and the EPA

disapproves that Third Party Candidate, the Settling Parties must propose at least one different

Third Party Candidate to the EPA, along with the information required by the preceding

Paragraphs, by no later than thirty (30) Days after the Settling Parties receive the EPA's

determination.  If the Settling Parties have proposed more than one Third Party Candidate to be

one of the required auditors and the EPA disapproves one, but not all, of the Third Party

Candidates, the Settling Parties may proceed with any EPA-approved Third Party Candidate

proposed for that auditor role.  If the Parties are unable to agree on a Third Party Candidate after

the Settling Parties have proposed at least three different Third Party Candidates for a given role

under the Consent Decree, the Settling Parties may invoke the Dispute Resolution process in

Section XII of this Consent Decree to resolve the selection of the Third Party Candidate for that

role.

### D. Environmental Management System.

27.    <u>Definitions for this sub-Section</u>:

(a) "EMS Action Plan" means a comprehensive plan and schedule for: (i)
bringing the Covered Natural Gas Processing Plants identified in Paragraph 28
into compliance with the EMS provisions specified in sub-Section VI.C of this
Consent Decree and (ii) resolving all of the EMS Audit Findings identified in the
EMS Audit Report and implementing the corrective actions recommended in the
EMS Audit Report.  The EMS Action Plan must explain the corrective actions
taken to resolve each of the EMS Audit Findings. The EMS Action Plan also must
identify the personnel or contractors assigned responsibility to implement the
required actions, and which actions they are responsible for.

(b) "EMS Audit" means the audit that the Settling Parties are required to conduct
pursuant to Paragraphs 33-34 of the Consent Decree.

(c) "EMS Auditor" means the Third Party Candidate approved by the EPA and
hired by the Settling Parties to conduct the EMS Audit and complete the
requirements of Paragraphs 35-36.

(d) "Environmental Performance" means the Settling Parties' progress toward
achieving their environmental targets and objectives, as well as their compliance
with Environmental Requirements.

(e) "Environmental Requirements" mean all requirements under federal, state, and
local environmental statutes and regulations, including permits and enforceable
agreements between the Settling Parties, EPA, and any federal, state or local
environmental regulatory agency, that apply to air quality or air pollution,
including, but not limited to, the Clean Air Act, 42 U.S.C. § 7401 *et seq*.

28.    <u>Purpose</u>.  The Settling Parties must implement an EMS in accordance with the

requirements of this sub-Section.  The purpose of the EMS is to improve and maintain the

Settling Parties' Environmental Performance at the following Covered Natural Gas Processing

Plants: the Benedum Gas Plant, b) the Jameson Gas Plant, c) the Martin County Gas Plant, d) the

Saint Lawrence Gas Plant, e) the Sale Ranch Gas Plant, and f) the Sonora Gas Plant.  The EMS

must establish the organizational structure, planning activities, responsibilities, practices,

procedures, processes and resources to enable each of the Settling Parties to develop, implement, achieve, review, and maintain compliance with Environmental Requirements. The EMS must incorporate the requirements of ISO 14001:2015 and the twelve "Compliance-Focused EMS Elements" referenced in the EPA's June 2005 "*Compliance-Focused Environmental Management System-Enforcement Agreement Guidance*" ("EPA EMS Guidance"), attached as Appendix A to this Consent Decree. For purposes of this sub-Section, in the event of an irreconcilable conflict between a requirement in ISO 14001:2015 and the EPA EMS Guidance, the requirement in ISO 14001:2015 applies.

29. <u>EMS Manual</u>. By no later than twelve (12) months after the Effective Date, the Settling Parties must submit to the EPA an "EMS Manual" that describes and documents the comprehensive EMS developed for the Settling Parties and the Covered Natural Gas Processing Plants identified in Paragraph 28. The EMS Manual is subject to EPA Comment. The EMS Manual must contain any overarching policies, processes, procedures, and programs that comprise the Settling Parties' EMS framework for the Covered Natural Gas Processing Plants identified in Paragraph 28, including the management systems, sub-systems, and tasks for implementing ISO 14001:2015 and the twelve Compliance-Focused EMS Elements referenced in the EPA EMS Guidance. The EMS Manual must also include specific plans and actions that the Settling Parties must take to:

    a. Implement the EMS in accordance with ISO 14001:2015 and the twelve Compliance-Focused EMS Elements referenced in the EPA EMS Guidance;

    b. Achieve compliance with Environmental Requirements;

    c. Achieve Environmental Performance; and

      d.      Ensure that each Settling Party has at least one employee that is trained in ISO 19011:2018 (Third edition) and the development and implementation of an ISO 14001:2015-compliant EMS.

The EMS Manual must contain a schedule of deadlines for the Settling Parties to fully implement each of the described systems, sub-systems, processes, procedures, plans, and actions. The EMS Manual must be evaluated during the EMS Audit described below.

30.     The Settling Parties must implement the EMS at each of the Covered Natural Gas Processing Plants identified in Paragraph 28 in accordance with the schedule and requirements contained in the EMS Manual.

31.     Managers responsible for environmental compliance at each of the Covered Natural Gas Processing Plants identified in Paragraph 28 must certify compliance with the approved EMS Manual in the Semi-Annual Reports submitted pursuant to Section IX (Reporting Requirements).  Any non-compliance with the approved EMS Manual must also be disclosed in the Semi-Annual Reports submitted pursuant to Section IX (Reporting Requirements), including an explanation of the cause of the non-compliance, the remedial steps the Settling Parties will take to resolve the non-compliance, and a date for achieving compliance.

32.     <u>Revisions of the EMS Manual</u>.  The Settling Parties must submit to the EPA a copy of any revisions to the EMS Manual until termination of the Consent Decree, provided that revisions that are solely typographical or re-organize content within the EMS Manual do not need to be submitted to the EPA.  Each revision of the EMS Manual must be dated and have a unique version number.  Revisions of the EMS Manual are subject to EPA Comment.

18

33.     EMS Audit.  By no later than one (1) year after the EMS Manual is completed, the Settling Parties must provide the EPA with a written proposal for at least one Third Party Candidate to be the EMS Auditor.

34.     By no later than 60 Days after the EPA approves a proposed EMS Auditor, or after completing the Dispute Resolution process with respect to approval of the EMS Auditor, the Settling Parties must enter into a contract with the approved Third Party Candidate to perform an EMS Audit of the Settling Parties and the Covered Natural Gas Processing Plants identified in Paragraph 28, as described below.  The contract must:

 a. Ensure that the approved EMS Auditor(s) conducts and completes an EMS Audit of the Settling Parties and the Covered Natural Gas Processing Plants identified in Paragraph 28 by no later than 15 months after the EPA approves the Third Party Candidate selected to be the EMS Auditor.

 b. Require that the EMS Audit is conducted in accordance with the current (as of the date the EMS Audit commences) version of ISO 19011, and require that the EMS Audit evaluates the EMS against the twelve Compliance-Focused EMS Elements referenced in the EPA EMS Guidance, ISO 14001:2015, and the completed EMS Manual.

 c. Require that the EMS Audit evaluate the adequacy of the EMS, across all levels of the Settling Parties' management, and throughout each major organizational unit at the Settling Parties and the Covered Natural Gas Processing Plants identified in Paragraph 28.

 d. Require that the EMS Audit evaluate, and identify any areas of concerns with respect to, the following:

    (1)   Whether there is a defined system, sub-system, process , or plan for each respective element of the twelve Compliance-Focused EMS Elements referenced in the EPA EMS Guidance;

    (2)   The extent to which each system, sub-system, process, or plan has been implemented, and is being used and maintained;

    (3)   The adequacy of the internal self-assessment procedures for programs and tasks comprising the EMS at each Covered Natural Gas Processing Plant identified in Paragraph 28;

    (4)   Whether the Settling Parties effectively communicate Environmental Requirements and other information as required in ISO 14001:2015 and the EMS Manual to affected parts of the organization, and those working on behalf of the organization, including contractors;

    (5)   Whether the Settling Parties ensure that contractors and consultants are properly trained to comply with and are complying with any Environmental Requirements associated with their work for the Settling Parties;

    (6)   Whether further improvements should be made to the EMS and EMS Manual to improve Environmental Performance and to better conform to the audit criteria and ISO 14001:2015; and

    (7)   Whether there are deviations in how the Settling Parties' written EMS documentation (*e.g.*, requirements or procedures regarding Environmental Requirements) are being implemented.

35.    <u>EMS Audit Report</u>.  By no later than 120 days after completing the EMS Audit, the EMS Auditor must prepare a report that explains the findings of the EMS Audit (the "EMS Audit Report") and submit that report to the EPA.  The EMS Audit Report must:

    a.   Explain the audit scope, provide a summary of the audit process, and explain any obstacles encountered.

    b.   Recite the period of time covered by the EMS Audit, and list the date(s) any on-site portion of the EMS Audit was conducted.

    c.   Identify the audit team members.

    d.   Identify any representatives of the Settling Parties observing the EMS Audit.

  e. Identify the recipients of the final EMS Audit Report.

  f. Include a written explanation of the instances of non-compliance noted during the EMS Audit, and the areas of concern identified during the course of the EMS Audit that, in the EMS Auditor's judgement, merit further review or evaluation for potential EMS, environmental, or regulatory impacts ("EMS Audit Findings").  The EMS Audit Report must also include the basis for each of the EMS Audit Findings;

  g. Include any necessary corrective actions for the Settling Parties to resolve the EMS Audit Findings and to improve their EMS and EMS Manual so that they are consistent with the EPA EMS Guidance and ISO 14001:2015, and to improve Environmental Performance.

  h. Identify any EMS Audit Findings corrected during the EMS Audit, including a description of the corrective measures and when they were implemented.

  i. Certify that the EMS Audit was conducted in accordance with this Decree.

36. <u>EMS Action Plan</u>.  By no later than 120 Days after receiving the EMS Audit Report, the Settling Parties must submit an EMS Action Plan to the EPA.  The EMS Action Plan must contain the corrective actions that the Settling Parties have taken or will take to address the EMS Audit Report's findings and recommendations, including a schedule for completing the EMS Audit Report's findings and recommendations.  The EMS Action Plan is subject to EPA Comment.  The Settling Parties must implement the EMS Action Plan in accordance with the schedules contained therein.

37. By no later than 15 months after receiving the EMS Audit Report, the Settling Parties must submit a written certification to the EPA that the corrective actions recommended in

the EMS Audit Report have been completed, along with an explanation of the corrective actions taken to resolve each of the EMS Audit Findings.

### E. Compliance with Clean Air Act Section 112(r)(7) and Chemical Accident Prevention Regulations.

38.     By no later than 45 Days after the Effective Date, the Settling Parties must provide the EPA with a written proposal, in accordance with sub-Section VI.C, for at least one Third Party Candidate to be the RMP Auditor(s).

39.     By no later than 60 Days after the EPA approves a Third Party Candidate to be the RMP Auditor(s), or after completing the Dispute Resolution process, the Settling Parties must enter into a contract with the approved Third Party Candidate(s).  The contract must:

   a.   Require the RMP Auditor(s) to conduct the RMP Audit.

   b.   Require the RMP Auditor(s) to prepare the RMP Audit Report.

   c.   Require the RMP Auditor(s) to certify that the RMP Audit and RMP Audit Report were completed in accordance with the Consent Decree.

40.     Process Hazard Analyses (PHAs) and Operating Procedures.

   a.   Revalidation of PHAs.  By no later than the Effective Date, the Settling Parties must ensure that each PHA for the Covered Natural Gas Processing Plants complies with 40 C.F.R. § 68.67.  For any PHA that does not comply with 40 C.F.R. § 68.67, those PHAs must be updated so that they do comply within three months after the Effective Date.

   b.   Updating Operating Procedures.  By no later than the Effective Date, the Settling Parties must evaluate the operating procedures for the Covered Natural Gas Processing Plants to ensure that each operating procedure

complies with 40 C.F.R. § 68.69.  Any operating procedures that do not

comply with 40 C.F.R. § 68.69 must be updated so that they do comply within

six months after the Effective Date.

41.     RMP Audits.  The East Vealmoor Gas Plant is subject to the requirements of

Paragraph 42.  All Covered Natural Gas Processing Plants except the Denton Gas Plant and East

Vealmoor Gas Plant are subject to the requirements of Paragraphs 43-47.

42.     For the East Vealmoor Gas Plant.  By no later than 15 Days after the Effective

Date, the Applicable Settling Party must complete a compliance audit of the East Vealmoor Gas

Plant in accordance with 40 C.F.R. § 68.79.

a.     The audit at the East Vealmoor Gas Plant must also evaluate whether, as

well as make recommendations to ensure, the Applicable Settling Party

has adequate procedures in place to cease operations and permanently

decommission the East Vealmoor Gas Plant in compliance with Clean Air

Act Section 112(r)(7), 42 U.S.C. § 7412(r)(7), and the Chemical Accident

Prevention Regulations.

b.     The Applicable Settling Party must promptly determine and document an

appropriate response to each of the findings of the compliance audit at the

East Vealmoor Gas Plant, and document that deficiencies have been

corrected, in accordance with 40 C.F.R. § 68.79(d).

43.     For all Covered Natural Gas Processing Plants except the Denton Gas Plant and

East Vealmoor Gas Plant.  By no later than 15 months after the EPA approves a Third Party

Candidate to be the RMP Auditor(s), the Settling Parties must complete a comprehensive audit

of the Settling Parties' compliance with Clean Air Act Section 112(r)(7), 42 U.S.C. § 7412(r)(7), and the Chemical Accident Prevention Regulations at each Covered Natural Gas Processing Plant (the "RMP Audit") except at the Denton Gas Plant (which is subject to Paragraph 18) and the East Vealmoor Gas Plant (which is subject to the preceding Paragraph).  The RMP Audit must also specifically evaluate and determine whether there are any deficiencies regarding:

a.      Comprehensiveness of Risk Management Plan.  Whether all processes that are subject to the Chemical Accident Prevention Regulations (*e.g.*, pressure vessels, compressors, storage tanks, piping systems, relief and vent systems and devices, emergency shutdown systems, controls, and pumps) are properly documented in the Covered Natural Gas Processing Plant's Risk Management Plan and included within the Covered Natural Gas Processing Plant's Risk Management Program.

b.      Adequacy of compliance management system.  Whether the Settling Parties are implementing a compliance management system(s) in accordance with 40 C.F.R. § 68.15 that will achieve and maintain compliance with the Chemical Accident Prevention Regulations at each Covered Natural Gas Processing Plant.  This audit element includes, but is not limited to, evaluating whether the Settling Parties' compliance management system:

(1)  Results in proper and prompt action to resolve each PHA finding and recommendation, as required by 40 C.F.R. § 68.67, and ensures that proper documentation is maintained of how each finding and recommendation is resolved.

24

(2) Results in proper and prompt action to resolve each finding of compliance audits, as required by 40 C.F.R. § 68.79, and ensures that proper documentation is maintained of how each deficiency has been corrected.

(3) Results in proper and prompt action to resolve each incident report finding, as required by 40 C.F.R. § 68.81, and ensures that proper documentation is maintained of how each finding and corrective action is resolved.

c. <u>Comprehensiveness and Adequacy of Risk Management Program</u>.

(1) For all the Covered Natural Gas Processing Plants except the St. Lawrence Gas Plant: whether all processes at these plants, including any process that produces, processes, handles, or stores any regulated substance (within the meaning of 40 C.F.R. § 68.3), are in compliance with Clean Air Act Section 112(r)(7), 42 U.S.C. § 71412(r)(7), and the "Program 3" Prevention Program requirements in the Chemical Accident Prevention Regulations (at 40 C.F.R. §§ 68.65 - 68.87).

(2) For the St. Lawrence Gas Plant: whether all processes at this plant, including any process that produces, processes, handles, or stores any regulated substance (within the meaning of 40 C.F.R. § 68.3), are in compliance with Clean Air Act Section 112(r)(7), 42 U.S.C. § 71412(r)(7), and the "Program 1" Prevention Program requirements in the Chemical Accident Prevention Regulations (at

25

40 C.F.R. § 68.12).

    (a)    If the St. Lawrence Gas Plant becomes subject to the "Program 3" Prevention Program requirements in the Chemical Accident Prevention Regulations (at 40 C.F.R. §§ 68.65 - 68.87) after the Effective Date, then, within 180 Days after the plant becomes subject to those requirements, the Applicable Settling Party must complete an audit of whether all processes at that plant comply with Clean Air Act Section 112(r)(7), 42 U.S.C. § 71412(r)(7), and the "Program 3" Prevention Program requirements in the Chemical Accident Prevention Regulations (at 40 C.F.R. §§ 68.65 - 68.87).  The audit must be conducted using the approved Third Party Candidate and must follow the audit protocol requirements of Paragraph 44.  The Applicable Settling Party must comply with the reporting and corrective action requirements of Paragraphs 45-47 in accordance with the timeframes listed in those Paragraphs.

d.    <u>Process Safety Information</u>.  Whether the Settling Parties maintain all required process safety information as controlled documentation and use an appropriate system for tracking and managing revisions to required process safety information.

e.    <u>Ensuring clear and proper procedures</u>.  Whether the Settling Parties have clear written procedures, both company-wide and specific to  each Covered Natural

26

Gas Processing Plant:

(1) That comply with the requirements to:

(a)  Properly and timely review and update off-site consequence analyses in accordance with 40 C.F.R. § 68.36.

(b)  Properly and timely review and update five-year accident histories at facilities in accordance with 40 C.F.R. § 68.42.

(c)  Properly and timely revise and update each of the Covered Natural Gas Processing Plant's Risk Management Plans at least every five years or as otherwise required in accordance with 40 C.F.R. § 68.190.

(d)  Properly and timely correct and update each Covered Natural Gas Processing Plant's Risk Management Plan as required in accordance with 40 C.F.R. § 68.195.

(2)  To properly and timely perform, update, and re-validate PHAs at each Covered Natural Gas Processing Plant in accordance with 40 C.F.R. § 68.67.

(3)  To properly and timely review written process operating procedures and certify them on an annual basis in accordance with 40 C.F.R. § 68.69.

(4)  To properly develop and provide timely initial training, as well as to properly develop and provide refresher training at least every three years, in accordance with 40 C.F.R. § 68.71.  This audit sub-element includes evaluating whether the Settling Parties training procedures comply with the requirements in Appendix D – Training Procedures.

(5)  To properly and timely maintain the on-going integrity of process

27

equipment in accordance with 40 C.F.R. § 68.73.

(6)  To properly and timely train each employee involved in maintaining the on-going integrity of process equipment in accordance with 40 C.F.R. § 68.73(c).

(7)  To adequately ensure employee participation and consulting on process safety management elements in accordance with 40 C.F.R. § 68.83.

(8)  To properly and timely issue hot work permits for hot work operations conducted on or near covered processes in accordance with 40 C.F.R. § 68.85.

f.    Recognized and Generally Accepted Good Engineering Practices (RAGAGEP).  Whether all processes at the Covered Natural Gas Processing Plants have been designed and are being operated and maintained in accordance with RAGAGEP for process safety that are applicable to stationary sources classified under North American Industrial Classification System (NAICS) code 211130 (formerly NAICS code 211112) and Standard Industrial Classification (SIC) code 1321.

g.    Key performance indicators ("KPIs").  Whether the Settling Parties have developed and effectively consider key performance indicators ("KPIs") (*i.e.*, metrics) based on the standards set forth in the following Table of Applicable Industry Standards that appropriately evaluate the Settling Parties' compliance with Clean Air Act Section 112(r)(7), 42 U.S.C. § 71412(r)(7), and the Chemical Accident Prevention Regulations at the

Covered Natural Gas Processing Plants:

| Table of Applicable Industry Standards | |
|---|---|
| **Standard** | **Title/Edition** |
| National Fire Protection Association (NFPA) 1 | Fire Code, 2015 Edition |
| NFPA 30 | Flammable and Combustible Liquids Code, 2021 Edition |
| NFPA 70 | National Electric Code, 2020 Edition |
| NFPA 70E | Standard for Electrical Safety in the Workplace, 2021 Edition |
| NFPA 77 | Recommended Practice on Static Electricity, 2019 Edition |
| NFPA 79 | Electrical Standards for Industrial Machinery, 2021 Edition |
| NFPA 101 | Life Safety Code, 2021 Edition |
| NFPA 5000 | Building Construction and Safety Code, 2021 Edition |
| American Society of Mechanical Engineers (ASME), Boiler and Pressure Vessel Code, Section VIII | Boiler and Pressure Vessel Code, Division 1, 2021 Edition |
| ASME B31.3 | Process Piping, 2014 Edition |
| American Petroleum Institute (API) Recommended Practice (RP) 500 | Recommended Practice for Classification of Locations for Electrical Installations at Petroleum Facilities Classified as Class I, Division I and Division 2, 3rd Edition |
| API RP 510 | Pressure Vessel Inspection Code: In-service Inspection, Rating, Repair, and Alteration, May 2014 |
| API RP 570 | Piping Inspection Code: In-service Inspection, Rating, Repair, and Alteration of Piping Systems, 3rd Edition, 2013 |
| API RP 576 | Inspection of Pressure Relieving Devices, 4th Edition, 2017 |

29

| API RP 653 | Tank Inspection, Repair, Alteration and Reconstruction, 5th Edition, 2014 |

     h.  Whether the procedures referenced in sub-Paragraphs 43(e) are being properly implemented at each Covered Natural Gas Processing Plant, and whether the KPIs referenced in sub-Paragraphs 43(g) are being properly considered by the Settling Parties to improve process safety management at each Covered Natural Gas Processing Plant.

44.    <u>RMP Audit Protocol</u>.  The RMP Audit must examine each of the elements described in the preceding Paragraph in accordance with the Center for Chemical Process Safety's *Guidelines for Auditing Process Safety Management Systems*, Second Edition (2011) and other appropriate guidance for purposes of completing such audits.

45.    <u>RMP Audit Report</u>.  By no later than 120 Days after completing the RMP Audit, the RMP Auditor must prepare a report that explains the findings of the RMP Audit (the "RMP Audit Report").  The RMP Audit Report must:

     a.  Explain the audit scope, provide a summary of the audit process, and explain any obstacles encountered.

     b.  Recite the period of time that the RMP Audit's evaluation covered, and list the date(s) any on-site portion of the RMP Audit was conducted.

     c.  Identify the audit team members.

     d.  Identify any representatives of the Settling Parties or regulatory agency personnel observing the RMP Audit.

     e.  Include a list of, copies of, or electronic links to all documents reviewed as part of the RMP Audit, as well as identify the Settling Parties' personnel that

were interviewed in support of the RMP Audit.

f.   Identify the recipients of the final RMP Audit Report.

g.   Include a written explanation of all instances of non-compliance with Clean
     Air Act Section 112(r)(7), 42 U.S.C. § 71412(r)(7), and the Chemical
     Accident Prevention Regulations that were noted at the Covered Natural Gas
     Processing Plants during the RMP Audit, and all areas of concern identified
     during the course of the RMP Audit that, in the RMP Auditor's judgement,
     merit further review or evaluation ("RMP Audit Findings").  The RMP Audit
     Report must also include the basis for each of the RMP Audit Findings.

h.   Include any necessary corrective actions for the Settling Parties to resolve the
     RMP Audit Findings, and to improve process safety management at the
     Covered Natural Gas Processing Plants.

i.   Identify any RMP Audit Findings corrected during the RMP Audit, including
     a description of the corrective measures and when they were implemented.

j.   Certify that the RMP Audit was conducted in accordance with this Decree.

46.   RMP Corrective Action Plan.  By no later than 90 Days after receiving the RMP
Audit Report, the Settling Parties must submit to the EPA an "RMP Corrective Action Plan" for
EPA Comment in accordance with the procedures set forth in Section VII (Review of
Deliverables).  The RMP Corrective Action Plan must include the Settling Parties' plan and
schedule for resolving the findings of the RMP Audit Report.  The Settling Parties must submit a
copy of the RMP Audit Report to the EPA along with the RMP Corrective Action Plan.

47.   The Settling Parties must implement the RMP Corrective Action Plan in
accordance with the schedules set forth therein.  No later than 18 months after submitting the

RMP Corrective Action Plan, the Settling Parties must submit a written certification to the EPA

that the corrective actions recommended in the RMP Audit Report have been fully implemented,

along with an explanation of the corrective actions taken to resolve each of the RMP Audit

Findings.

## VII.    REVIEW OF DELIVERABLES

48.    Deliverables Subject to "EPA Comment."  For deliverables that are subject to

EPA Comment, if the EPA submits comments to the Settling Parties then, within 60 Days after

receiving such comments, the Settling Parties must either: (i) revise and complete the deliverable

in accordance with the EPA's written comments, and submit the revised deliverable to the EPA,

or (ii) submit the matter for dispute resolution under Section XII of this Consent Decree.

## VIII.   PERMITS

49.    Where any compliance obligation under this Consent Decree requires the Settling

Parties to obtain a federal, state, or local permit or approval, the Settling Parties must submit

timely and complete applications and take all other actions necessary to obtain all such permits

or approvals.  The Settling Parties may seek relief under the provisions of Section XI (Force

Majeure) for any delay in the performance of any such obligation resulting from a failure to

obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if the

Settling Parties have submitted timely and complete applications and has taken all other actions

necessary to obtain all such permits or approvals.

## IX.    REPORTING REQUIREMENTS

50.    The Settling Parties must submit the following "Semi-Annual Reports" to the

EPA and DOJ at the addresses set forth Section XVI (Notices):

      a.    First Semi-Annual Report.  The Settling Parties must submit a first Semi-

Annual Report by no later than July 31, 2022.  The first Semi-Annual Report must include the information listed in Paragraph 50(c) for the time period between the Effective Date and the date of the first Semi-Annual Report.

        b.      <u>Subsequent Semi-Annual Reports</u>.  The Settling Parties must submit subsequent Semi-Annual Reports by no later than January 31 and July 31 of each year until termination of this Decree pursuant to Section XX.

        c.      Each subsequent Semi-Annual Report must include the following information for the six months preceding the date of the report:

    (1)    A description of the status of work performed and progress made toward implementing all requirements of Section VI (Compliance Requirements) at the Covered Natural Gas Processing Plants.  This topic should describe any major milestones completed and remaining to be completed.  This includes an update on the status of efforts to permanently cease operations and decommission the Denton Gas Plant and the East Vealmoor Gas Plant.

    (2)    The status of implementing the EMS and any corrective actions for each EMS Audit Finding.

    (3)    The status of implementing the corrective actions for each RMP Audit Finding.

    (4)    Copies of the EMS Manual compliance certifications required by Paragraph 31, and any information regarding non-compliance with the EMS Manual required by Paragraph 31.

    (5)    A listing of any mechanical integrity inspections required under 40 C.F.R. § 68.73 that are overdue at any point during the reporting period for the following process equipment at each covered process located at each Covered Natural Gas Processing Plant:

        a.   Pressure vessels;

        b.   Storage tanks; and

        c.   Piping systems (including, but not limited to, piping components such as valves).

The list of overdue mechanical integrity inspections must be grouped by process unit and must include the reason for the delayed inspection and anticipated schedule for completing the inspection.

(6)     A description of any problems encountered or anticipated, together with implemented or proposed solutions.

(7)     A description of the status of any necessary permit applications or efforts to surrender the Title V Operating Permits for the Denton Gas Plant and East Vealmoor Gas Plant.

d.     Each Semi-Annual Report must also include a description of any non-compliance with the requirements of this Consent Decree and an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation.  If the Settling Parties violate, or have reason to believe that they may violate, a requirement of this Consent Decree, the Applicable Settling Party must notify the DOJ and EPA (in accordance with Section XVI (Notices)) of these violations and their likely duration, in writing, within ten (10) business days of the Day the Settling Parties first become aware of the violation.  This notice must include an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation.  If the cause of a violation cannot be fully explained at the time the report is due, the Settling Parties must state that in the report. The Settling Parties must investigate the cause of the violation and must then submit an amendment to the report, including a full explanation of the cause of the violation, within 45 Days of the Day the Settling Parties become aware of the cause of the violation. Nothing in this Paragraph or the following Paragraph relieves the Settling Parties of their obligation to provide the notice required by Section XI (Force Majeure).

51.     The Settling Parties must notify the EPA as soon as possible, but no later than 24 hours after the Settling Parties first know of any violation of this Consent Decree or any other

34

event affecting the Settling Parties' performance under this Consent Decree, or the performance

of any Covered Natural Gas Processing Plant, that poses an immediate threat of an accidental

release from a covered process that will result in onsite or offsite death, injury, significant

property damage, environmental damage, offsite evacuations, or sheltering in place.  This

procedure is in addition to the requirements set forth in the preceding Paragraph.

52.     Each Semi-Annual Report submitted by the Settling Parties under this Section

must be signed by an official of the submitting party and include the following certification:

> I certify under penalty of law that this document and all attachments were
> prepared under my direction or supervision in accordance with a system designed
> to assure that qualified personnel properly gather and evaluate the information
> submitted.  Based on my inquiry of the person or persons who manage the system,
> or those persons directly responsible for gathering the information, the
> information submitted is, to the best of my knowledge and belief, true, accurate,
> and complete.  I have no personal knowledge that the information submitted is
> other than true, accurate, and complete.  I am aware that there are significant
> penalties for submitting false information, including the possibility of fine and
> imprisonment for knowing violations.

53.     This certification requirement does not apply to emergency or similar

notifications where compliance would be impractical.

54.     The reporting requirements of this Consent Decree do not relieve the Settling

Parties of any reporting obligations required by the Clean Air Act or implementing regulations,

or by any other federal, state, or local law, regulation, permit, or other requirement.

55.     Any information provided pursuant to this Consent Decree may be used by the

United States in any proceeding to enforce the provisions of this Consent Decree and as

otherwise permitted by law.

## X.     STIPULATED PENALTIES

56.     The Settling Parties are liable for stipulated penalties to the United States for

violations of this Consent Decree as specified below, unless excused under Section XI (Force

Majeure).  A violation includes failing to perform any obligation required by the terms of this Consent Decree, including any work plan or schedule approved under this Consent Decree, according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

57.    Late Payment of Civil Penalty.  If the Defendants fail to pay the civil penalty required to be paid under Section V (Civil Penalty) when due, the Defendants must pay a stipulated penalty of $10,000 per Day for each Day that the payment is late.

58.    Compliance Milestones.

a.    The following stipulated penalties shall accrue per violation per Day for each violation of the requirements identified in Paragraphs 19-47:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1,000 | 1st through 14th Day |
| $2,000 | 15th through 30th Day |
| $3,000 | 31st Day through 60th Day |
| $4,000 | 61st Day and beyond |

59.    Reporting Requirements.  The following stipulated penalties accrue per violation per Day for each violation of the reporting requirements of Section IX:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $250 | 1st through 14th Day |
| $1,000 | 15th through 30th Day |
| $1,500 | 31st Day and beyond |

60.    Stipulated penalties under this Section begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and continue to

accrue until performance is satisfactorily completed or until the violation ceases. Stipulated penalties accrue simultaneously for separate violations of this Consent Decree.

61.    The Settling Parties must pay any stipulated penalty within 30 Days of receiving the United States' written demand.

62.     The United States may in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

63.    Stipulated penalties continue to accrue as provided in Paragraph 60, during any Dispute Resolution, but need not be paid until the following:

       a.    If the dispute is resolved by agreement of the Parties or by a decision of EPA that is not appealed to the Court, the Settling Parties must pay accrued penalties determined to be owing, together with interest, to the United States within 30 Days of the effective date of the agreement or the receipt of the EPA's decision or order.

       b.    If the dispute is appealed to the Court and the United States prevails in whole or in part, the Settling Parties must pay all accrued penalties determined by the Court to be owing, together with interest, within 60 Days of receiving the Court's decision or order, except as provided in subparagraph c, below.

       c.    If any Party appeals the District Court's decision, the Settling Parties must pay all accrued penalties determined to be owing, together with interest, within 15 Days of receiving the final appellate court decision.

64.    The Settling Parties must pay stipulated penalties owing to the United States in the manner set forth in Paragraph 14 and with the confirmation notices required by Paragraph 15, except that the transmittal letter must state that the payment is for stipulated penalties and must state for which violation(s) the penalties are being paid.

37

65.     If the Settling Parties fail to pay stipulated penalties according to the terms of this Consent Decree, the Settling Parties are liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.  Nothing in this Paragraph shall be construed to limit the United States from seeking any remedy otherwise provided by law for the Settling Parties' failure to pay any stipulated penalties.

66.     The payment of penalties and interest, if any, will not alter in any way the Settling Parties' obligation to complete the performance of the requirements of this Consent Decree.

67.     <u>Non-Exclusivity of Remedy</u>.  Stipulated penalties are not the United States' exclusive remedy for violations of this Consent Decree.  Subject to the provisions of Section XIV (Effect of Settlement/Reservation of Rights), the United States expressly reserves the right to seek any other relief it deems appropriate for the Settling Parties' violation of this Consent Decree or applicable law, including but not limited to an action against the Settling Parties for statutory penalties, additional injunctive relief, mitigation or offset measures, and/or contempt. However, the amount of any statutory penalty assessed for a violation of this Consent Decree shall be reduced by an amount equal to the amount of any stipulated penalty assessed and paid pursuant to this Consent Decree.

## XI.     FORCE MAJEURE

68.     "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of the Settling Parties, of any entity controlled by the Settling Parties, or of the Settling Parties' contractors, that delays or prevents the performance of any obligation under this Consent Decree despite the Settling Parties' best efforts to fulfill the obligation.  The requirement that the Settling Parties exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best

38

efforts to address the effects of any potential force majeure event (a) as it is occurring and (b) following the potential force majeure, such that the delay and any adverse effects of the delay are minimized.  "Force Majeure" does not include the Settling Parties' financial inability to perform any obligation under this Consent Decree.

69.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, the Settling Parties must provide notice by telephone or by electronic mail to the EPA points of contact listed in Section XVI (Notices), within 72 hours of when the Settling Parties first knew that the event might cause a delay.  Within 14 Days thereafter, the Settling Parties must provide a written explanation to the EPA that describes the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; the Settling Parties' rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of the Settling Parties, such event may cause or contribute to an endangerment to public health, welfare or the environment.  The Settling Parties must include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure.  Failure to comply with the above requirements will preclude the Settling Parties from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure.  The Settling Parties are deemed to know of any circumstance of which the Settling Parties, any entity controlled by the Settling Parties, or the Settling Parties' contractors knew or should have known.

70.     If the EPA agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by the EPA for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the force majeure event must not, of itself, extend the time for performance of any other obligation.  The EPA will notify the Settling Parties in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

71.     If the EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, the EPA will notify the Settling Parties in writing of its decision.

72.     If the Settling Parties elect to invoke the dispute resolution procedures set forth in Section XII (Dispute Resolution), they must do so no later than 15 Days after receiving the EPA's notice.  In any such proceeding, the Settling Parties have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that the Settling Parties complied with the requirements of Paragraphs 68 and 69.  If the Settling Parties carry this burden, the delay at issue shall not be a violation by the Settling Parties of the affected obligation of this Consent Decree identified to the EPA and the Court.

## XII.   DISPUTE RESOLUTION

73.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section must be the exclusive mechanism to resolve disputes

arising under or with respect to this Consent Decree.  The Settling Parties' failure to seek resolution of a dispute under this Section precludes the Settling Parties from raising any such issue as a defense to an action by the United States to enforce any obligation of the Settling Parties arising under this Consent Decree.

74.     <u>Informal Dispute Resolution</u>.  Any dispute subject to Dispute Resolution under this Consent Decree must first be the subject of informal negotiations.  The dispute must be considered to have arisen when the Settling Parties send the DOJ and EPA a written Notice of Dispute.  Such Notice of Dispute must clearly state the matter in dispute.  The period of informal negotiations must not exceed 60 Days from the date the dispute arises, unless that period is modified by written agreement.  If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within 45 Days after the conclusion of the informal negotiation period, the Settling Parties invoke formal dispute resolution procedures as set forth below.

75.     <u>Formal Dispute Resolution</u>.  The Settling Parties must invoke formal dispute resolution procedures, within the 45-Day time period provided in the preceding Paragraph, by sending the DOJ and EPA a written Statement of Position regarding the matter in dispute.  The Statement of Position must include, but need not be limited to, any factual data, analysis, or opinion supporting the Settling Parties' position and any supporting documentation relied upon by the Settling Parties.

76.     The United States will send the Settling Parties its Statement of Position within 60 Days after receiving the Settling Parties' Statement of Position.  The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States.

The United States' Statement of Position will be binding on the Settling Parties, unless the Settling Parties file a motion for judicial review of the dispute in accordance with the following Paragraph.

77.     The Settling Parties may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section XVI (Notices), a motion requesting judicial resolution of the dispute.  The motion must be filed within 30 Days of receiving the United States' Statement of Position pursuant to the preceding Paragraph.  The motion must contain a written statement of the Settling Parties' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and must set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

78.     The United States shall respond to the Settling Parties' motion within the time period allowed by the Local Rules of this Court.  The Settling Parties may file a reply memorandum, to the extent permitted by the Local Rules.

79.     Standard of Review.  Except for disputes raised about modifications to the Consent Decree, which are subject to the standard of review in Paragraph 99, in any dispute brought under Paragraph 75, the Settling Parties bear the burden of demonstrating that their position complies with this Consent Decree and the CAA.

80.     Invoking the dispute resolution procedures under this Section will not, by itself, extend, postpone, or affect in any way any of the Settling Parties' obligations under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter continue to accrue from the first Day of noncompliance, but payment will be stayed pending resolution of the dispute as provided in Paragraph 63.  If the

Settling Parties do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section X (Stipulated Penalties).

## XIII.   INFORMATION COLLECTION AND RETENTION

81.   The United States and its representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree, at reasonable times, upon presentation of credentials, to:

a.   monitor the progress of activities required under this Consent Decree;

b.   verify any data or information submitted to the United States in accordance with the terms of this Consent Decree;

c.   obtain documentary evidence, including photographs and similar data; and

d.   assess the Settling Parties' compliance with this Consent Decree.

82.   Notwithstanding Section XX (Termination), for five years after the termination of this Consent Decree, the Settling Parties shall preserve and retain, and must instruct their contractors and agents to preserve and retain, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in the Settling Parties' or Settling Parties' contractors' or agents' possession or control, or that come into their or their contractors' or agents' possession or control, and that relate in any manner to the Settling Parties' performance of their obligations under this Consent Decree.  This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures.  At any time during this information-retention period, upon request by the United States, the Settling Parties must provide copies of any documents, records, or other information required to be maintained under this Paragraph except if the information is privileged under the attorney-client privilege or any other privilege recognized by federal law.  If

the Settling Parties assert that any of the requested information is subject to a claim of privilege or that it is Confidential Business Information ("CBI"), the Settling Parties must follow the requirements in the following two Paragraphs regarding privileged information and CBI.

83.    At the conclusion of the information-retention period provided in the preceding Paragraph, the Settling Parties must notify the United States at least 90 Days before destroying any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States, the Settling Parties must deliver any such documents, records, or other information to the EPA.  The Settling Parties may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law.  If the Settling Parties assert such a privilege, it must provide the following: (a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of the subject of the document, record, or information; and (f) the privilege asserted by the Settling Parties.  However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree may be withheld on grounds of privilege.

84.    The Settling Parties may also assert that information required to be provided under this Section is protected as CBI under 40 C.F.R. Part 2.  As to any information that the Settling Parties seek to protect as CBI, the Settling Parties must follow the procedures set forth in 40 C.F.R. Part 2.

85.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of the Settling

Parties to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XIV.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

86.    This Consent Decree resolves the civil claims of the United States for the violations alleged in the Complaint filed in this action through the Date of Lodging.

87.    The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree.  This Consent Decree shall not be construed to limit the rights of the United States to obtain penalties or injunctive relief under the Clean Air Act or implementing regulations, or under other federal or state laws, regulations, or permit conditions, except as expressly specified in Paragraph 86.  The United States further reserves all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, the Covered Natural Gas Processing Plants whether related to the violations addressed in this Consent Decree or otherwise.

88.     In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, civil penalties, other appropriate relief relating to a Covered Natural Gas Processing Plant or the Settling Parties' violations, the Settling Parties shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 86.

89.    This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws or regulations.  The Settling Parties are responsible for achieving and

maintaining complete compliance with all applicable federal, state, and local laws, regulations, and permits; and the Settling Parties' compliance with this Consent Decree will be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States does not, by its consent to the entry of this Consent Decree, warrant or aver in any manner that the Settling Parties' compliance with any aspect of this Consent Decree will result in compliance with provisions of the Clean Air Act, 42 U.S.C. §7401, *et seq.*, or with any other provisions of federal, state, or local laws, regulations, or permits.

90.     This Consent Decree does not limit or affect the rights of the Settling Parties or of the United States against any third parties, that are not a party to this Consent Decree, nor does it limit the rights of third parties, that are not a party to this Consent Decree, against the Settling Parties, except as otherwise provided by law.

91.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party that is not a party to this Consent Decree.

## XV.    COSTS

92.     The Parties must bear their own costs of this action, including attorneys' fees, except that the United States is entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by the Settling Parties.

## XVI.   NOTICES

93.     Unless otherwise specified in this Decree, whenever notifications, deliverables, submissions, or communications ("Notices") are required by this Consent Decree, they must be made in writing and transmitted as follows. For the United States, Notices must be sent by mail or email, with a preference for email, to the recipients listed below. For the EPA, the Settling

46

Parties must register with the EPA's electronic reporting system (currently known as the "Central Data Exchange" or "CDX" system) and transmit all Notices to the EPA by uploading them to the electronic reporting system.  The Settling Parties must also send a copy of all Notices via email to the EPA recipients listed below.  Any Notices that cannot be uploaded to the CDX system or transmitted electronically via email must be mailed to the addresses below:

As to DOJ by email:                    eescdcopy.enrd@usdoj.gov
                                       **Re: DJ # 90-5-2-1-12232**

As to DOJ by mail:                     EES Case Management Unit
                                       Environment and Natural Resources Division
                                       U.S. Department of Justice
                                       P.O. Box 7611
                                       Washington, D.C.  20044-7611
                                       **Re: DJ # 90-5-2-1-12232**

As to the United States Attorney
for the Northern District of Texas
by mail:                               Ann Haag
                                       Assistant United States Attorney
                                       Northern District of Texas
                                       Lubbock Division
                                       1205 Texas Ave., Suite 700
                                       Lubbock, Texas  79401
                                       Ann.Haag@usdoj.gov

As to the EPA via the CDX electronic system: https://cdx.epa.gov


As to EPA OECA:

Director, Air Enforcement Division
U.S. Environmental Protection Agency
Office of Civil Enforcement
1200 Pennsylvania Ave, NW
Mail Code:  2201A
Washington, DC 20460

<u>As to EPA Region 6</u>:

Chief, Air Enforcement Branch
U.S. Environmental Protection Agency
Region 6
1201 Elm Street, Suite 500
Mail Code: ECDA
Dallas, TX 75270

Associate Director
Air, Toxics, and Inspections Coordination
Branch (6 EN-A)
United States EPA, Region 6
1201 Elm Street, Suite 500
Dallas, Texas 75270-2102

<u>As to EPA by email</u>:

stucky.maria@epa.gov

<u>As to the Settling Parties</u>:

Mr. Joshua P. Ham
Corporate General Counsel
WTG Gas Processing, LLC
303 Veterans Airpark Lane, Suite 5000
Midland, TX 79705
Email: jham@westtexasgas.com

and

Scott Janoe
Baker Botts L.L.P.
910 Louisiana Street
Houston, Texas 77002
Email: Scott.janoe@bakerbotts.com

94.     Any Party may, by written notice to the other Parties, change its designated notice

recipient or notice address provided above.

95.     Notices submitted pursuant to this Section are deemed submitted upon mailing,

transmission by email, or uploading to the EPA's CDX system unless otherwise provided in this

Consent Decree or by mutual agreement of the Parties in writing.

## XVII.  EFFECTIVE DATE

96.     The Effective Date of this Consent Decree is the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XVIII.  RETENTION OF JURISDICTION

97.     The Court retains jurisdiction over this case until termination of this Consent Decree, for the purpose of: a) resolving disputes arising under this Consent Decree pursuant to Section XII, b) entering orders modifying this Decree pursuant to Section XIX, or c) effectuating or enforcing compliance with the terms of this Consent Decree.

## XIX.  MODIFICATION

98.     Except as otherwise set forth in Paragraphs 14 and 94, the terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties.  Where the modification constitutes a material change to this Consent Decree, it must be effective only upon approval by the Court.

99.     Any disputes concerning modification of this Consent Decree must be resolved pursuant to Section XII (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 79, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XX.  TERMINATION

100.     Before seeking termination of the Consent Decree, the Settling Parties must have:

   a.     Paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree.

b.      Completed all requirements of Section VI (Compliance Requirements).

c.      Received all Title V operating permits in accordance with Section VI.B.

101.    After the Settling Parties believe they have satisfied the conditions for termination set forth in the preceding Paragraph, the Settling Parties may serve upon the United States a "Request for Termination."  This Request for Termination must demonstrate that the Settling Parties have satisfied all requirements for termination set forth in the preceding Paragraph, as well as include all necessary supporting documentation.

102.    Following receipt by the United States of the Settling Parties' Request for Termination, the Parties must confer informally concerning the Request and any disagreement that the Parties may have as to whether the Settling Parties have satisfactorily complied with the requirements for terminating this Consent Decree.  If the United States agrees that the Consent Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Consent Decree.

103.    If the United States does not agree that the Decree may be terminated, or if the Settling Parties do not receive a response from the United States within 120 days of the Settling Parties' submission of the Request for Termination, the Settling Parties may invoke Dispute Resolution under Section XII.

## XXI.   PUBLIC PARTICIPATION

104.    This Consent Decree must be lodged with the Court for a period of not less than 30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate.  The Settling Parties consent to entry of this Consent Decree without

further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States has notified the Settling Parties in writing that it no longer supports entry of the Decree.

## XXII.  SIGNATORIES/SERVICE

105.    Each undersigned representative of the Settling Parties, the EPA, and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

106.    This Consent Decree may be signed in counterparts, and its validity must not be challenged on that basis.  The Settling Parties agree to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.  The Settling Parties need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this Consent Decree.

## XXIII. INTEGRATION

107.    This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

51

## XXIV.  FINAL JUDGMENT

108.    Upon approval and entry of this Consent Decree by the Court, this Consent

Decree constitutes a final judgment of the Court as to the United States and Settling Parties.

## XXV.  26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

109.    For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the

Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), and 26 C.F.R. § 1.162-21(b)(2),

performance of Section II (Applicability), Paragraph 9; Section VI (Compliance Requirements),

Paragraphs 18-47; Section VII (Review of Deliverables), Paragraph 48; Section VIII (Permits),

Paragraph 49; Section IX (Reporting Requirements), Paragraphs 50-52; and Section XIII

(Information Collection and Retention), Paragraphs 81-83, is restitution or required to come into

compliance with law.

## XXVI.  APPENDICES

110.    The following Appendix is attached to and part of this Consent Decree:

"Appendix A" is the EPA EMS Guidance.

Dated and entered this ___3rd___ day of ___February_____, 202_2____

_____

UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF TEXAS

Subject to the notice and comment provisions of 28 C.F.R. § 50.7, THE UNDERSIGNED PARTIES enter into this Consent Decree entered in the matter of the *United States v. WTG Gas Processing, L.P., et al.* (N.D. Tex.).

**FOR THE UNITED STATES OF AMERICA:**

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

STEVEN D. SHERMER
District of Columbia Bar No. 486394
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044-7611
202-514-1134 (Phone)
Steven.Shermer@usdoj.gov


PRERAK SHAH
Acting United States Attorney
Northern District of Texas

Ann Haag
Assistant United States Attorney
Northern District of Texas
Lubbock Division
1205 Texas Ave., Suite 700
Lubbock, Texas  79401
806-472-7397 (Phone)
Ann.Haag@usdoj.gov

Subject to the notice and comment provisions of 28 C.F.R. § 50.7, THE UNDERSIGNED PARTIES enter into this Consent Decree entered in the matter of the *United States v. WTG Gas Processing, L.P, et al.* (N.D. Tex.).

**FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

LAWRENCE STARFIELD

Digitally signed by
LAWRENCE STARFIELD
Date: 2021.09.24 16:42:40
-04'00'

LAWRENCE STARFIELD
Acting Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C.  20460

Subject to the notice and comment provisions of 28 C.F.R. § 50.7, THE
UNDERSIGNED PARTIES enter into this Consent Decree entered in the matter of the *United
States v. WTG Gas Processing, L.P., et al.* (N.D. Tex.).

**FOR THE UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, REGION 6**

JAMES
MCGUIRE

Digitally signed by JAMES MCGUIRE
DN: c=US, o=U.S. Government,
ou=Environmental Protection Agency,
cn=JAMES MCGUIRE,
0.9.2342.19200300.100.1.1=68001003977
115
Date: 2021.09.08 10:43:14 -05'00'

_____

JAMES McGUIRE
Regional Counsel
U.S. Environmental Protection Agency, Region 6
1201 Elm Street
Dallas, TX  75270

Digitally signed by CHERYL SEAGER
DN: c=US, o=U.S. Government,
ou=Environmental Protection Agency,
cn=CHERYL SEAGER,
0.9.2342.19200300.100.1.1=68001003651793
Date: 2021.09.08 11:08:11 -05'00'

_____

CHERYL SEAGER
Director - Compliance Assurance and Enforcement
Division
U.S. Environmental Protection Agency, Region 6

THE UNDERSIGNED PARTIES enter into this Consent Decree entered in the matter of the *United States v. WTG Gas Processing, L.P., et al.* (N.D. Tex.).

**FOR EACH OF THE FOLLOWING SETTLING PARTIES: WTG GAS PROCESSING, LLC, WTG SOUTH PERMIAN MIDSTREAM LLC, WTG NORTH PERMIAN MIDSTREAM LLC, and WTG JAMESON, L.P.**

JOHN T. STEEN, *as*
*President of each of these Settling Parties*

**FOR EACH OF THE FOLLOWING SETTLING PARTIES: DAVIS GAS PROCESSING, INC., and WTG GAS PROCESSING, L.P.**

RICHARD D. HATCHETT, *as*
*Executive Vice President of each of these Settling Parties*

*United States*

*v.*

*WTG Gas Processing, L.P., et al.* **(N.D. of Tex.)**

## Appendix A to Consent Decree

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
OFFICE OF ENFORCEMENT AND COMPLIANCE ASSURANCE
OFFICE OF CRIMINAL ENFORCEMENT, FORENSICS AND TRAINING

*EPA-330/9-97-002R*

**Compliance-Focused Environmental
Management System -
Enforcement Agreement Guidance**

August 1997
Revised January 2000
Revised December 2001
Revised August 2002
Revised June 2005

Steven W. Sisk

NATIONAL ENFORCEMENT INVESTIGATIONS CENTER
Diana A. Love, Director
Denver, Colorado

Compliance-Focused Environmental Management System
Enforcement Agreement Guidance

CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SYNOPSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
COMPLIANCE-FOCUSED ENVIRONMENTAL MANAGEMENT SYSTEM
  ELEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Environmental Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Organization, Personnel, and Oversight of Ems . . . . . . . . . . . . . . . . . . . . . . . 5
    Accountability and Responsibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Environmental Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Assessment, Prevention, and Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Environmental Incident and Non-compliance Investigations . . . . . . . . . . . . . . 7
    Environmental Training, Awareness, and Competence . . . . . . . . . . . . . . . . . . . 7
    Environmental Planning and Organization Decision-Making . . . . . . . . . . . . . . 7
    Maintenance of Records and Documentation . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Pollution Prevention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Continuing Program Evaluation and Improvement . . . . . . . . . . . . . . . . . . . . . 8
    Public Involvement/Community Outreach . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

APPENDICES

A     Model Settlement Agreement Language for Ems Improvements (7 Pages)
B     Supplementary Requirements for Iso 14001-2004 (second edition) (3 pages)

## INTRODUCTION

**SYNOPSIS**

Since the late 1980s, civil multimedia compliance investigations conducted by the EPA National Enforcement Investigations Center (NEIC) have increasingly involved identifying causes of observed noncompliance. In many cases, the causes arise from inadequate environmental management systems (EMSs).[1] NEIC, in response, developed key elements for a compliance-focused EMS (CFEMS) model, which have been used as the basis for EMS requirements in many enforcement settlement agreements. The purpose of this guidance is to present those key elements and to show, through the "Model Settlement Agreement Language" [Appendix A], how the elements are typically incorporated into such agreements.

**BACKGROUND**

EPA has determined that properly designed and implemented EMSs can help promote positive environmental outcomes. The EPA Office of Enforcement and Compliance Assurance (OECA) supports the Agency's EMS policy, as expressed in the *USEPA EMS Position Statement*, to encourage the widespread use of EMSs across a range of organizations and settings, with particular emphasis on adopting EMSs to achieve improved environmental performance, including compliance, pollution prevention, and continual improvement in all areas, regulated and unregulated.[2]

OECA strongly encourages all organizations interested in focusing their EMSs on compliance to reference the CFEMS model as a potentially useful tool for supplementing existing EMS standards. However, OECA does not advocate that EMSs associated with voluntary EPA programs [e.g., National Environmental Performance Track (NEPT) and the Public Entity Environmental Management System Resource (PEER) Center/Local Government Program [3]], need to incorporate the *CFEMS* 12 elements. The *CFEMS* model has been developed for application in

---

[1]    *The International Organization for Standardization (ISO) defines an EMS as "that part of the overall management system which includes organizational structure, planning activities, responsibilities, practices, procedures, processes and resources for developing, implementing, achieving, reviewing, and maintaining [the organization's] environmental policy." The EMS provides the structure by which specific activities related to environmental protection and compliance can be effectively and efficiently carried out.*

[2]    *The USEPA Position Statement on EMSs (EMS Position Statement; May 15, '02) is available at <http://www.epa.gov/ems/policy/position.htm>.*

[3]    *The PEER Center is supported by a cooperative agreement between EPA's Office of Water and the Global Environment and Technology Foundation. OECA has supported and provided funding for this program. The PEER Center has developed a national clearinghouse of EMS information with a focus on municipalities. In July 2002, EPA also designated eight Local Resource Centers around the country to provide assistance to local governments interested in adopting EMSs. The PEER Center website may be accessed at <http://www.peercenter.net/>.*

enforcement actions as injunctive relief for defendants with violations caused by management failures. Increasingly, however, we are learning that organizations, domestic and international, are consulting the *CFEMS* Guidance in enhancing their EMSs or voluntary EMS guidelines to better address internal and external compliance concerns. OECA encourages this as beneficial to both the implementing organizations and external stakeholders.

EPA's approach to EMSs in enforcement actions (as opposed to when EPA is promoting EMSs through voluntary programs, compliance assistance, or other non-enforcement means) is to focus on seeking the appropriate injunctive relief to return violators to compliance and minimize or eliminate the potential for repeat violations.

To achieve maximum benefit from the *CFEMS* elements, the overall EMS, in which they are incorporated, should embody the "plan, do, check, and act" model for continual improvement and address both regulated and unregulated aspects and impacts. Consequently, the *CFEMS Guidance* is intended to supplement, not replace, EMS standards such as ISO 14001 developed by voluntary consensus standards bodies. The *CFEMS* 12 elements support the broad, multimedia, beyond-compliance approaches that are the hallmarks of an effective, functioning EMS. They supplement existing EMS voluntary consensus standards by filling potential compliance-related gaps.

Settlement agreements that require EMS improvements typically require that the organization conduct an initial review of its current environmental management practices, followed by development of a comprehensive CFEMS that must be documented in a manual. The EMS manual must contain overarching policies, procedures, and programs that compose the facility-wide (or organization-wide) EMS framework, and describe respective management systems, subsystems, and tasks for the 12 key elements. After the organization has had sufficient time to implement and refine the EMS (usually 1 to 3 years), the agreement should require at least one EMS audit by an independent third-party auditor to verify implementation, with results reported to both the organization and EPA. However, additional audits, including compliance audits, are often required, as individual circumstances dictate. The audits also serve to promote further EMS improvement and more effective implementation.

The intended result of this approach is twofold: first, to have the organization develop an EMS that will both improve its compliance with applicable environmental requirements and, second, to improve its environmental performance through setting and achieving the organization's environmental targets and objectives.

The 12 key elements of a CFEMS addressed in this guide were compiled from a number of sources, as mentioned in previous revisions, and notably include:  EMS assessment protocols developed by Deloitte and Touche LLP of San Francisco for the Global Environmental Management Initiative (1992) and an industrial client (1994); and ISO 14001 "Environmental management systems - Specification with guidance for use" (1996 and 2004).

The current revision involved expanding the Introduction to better describe the relationship of the CFEMS Guidance to EPA's overall EMS policy and its consistency with that policy, as well as revising the elements and the model settlement agreement language in Attachments A and B (new).[4]

## COMPLIANCE-FOCUSED ENVIRONMENTAL MANAGEMENT SYSTEM ELEMENTS

1.   **Environmental Policy**

    a.   This policy, upon which the EMS is based, must clearly communicate management commitment to achieving compliance with applicable federal, state, and local environmental statutes, regulations, enforceable agreements, and permits (hereafter, "environmental requirements"), minimizing risks to the environment from unplanned or unauthorized releases of hazardous or harmful contaminants, and continual improvement in environmental performance.   The policy should also state management's intent to provide adequate personnel and other resources for the EMS.

2.   **Organization, Personnel, and Oversight of EMS**

    a.   Identifies and defines specific duties, roles, responsibilities, and authorities of key environmental staff in implementing and sustaining the EMS (e.g., could include position descriptions and/or performance standards for all environmental department personnel, and excerpts from others having specific environmental duties, and regulatory compliance responsibilities).

    b.   Includes organization charts that identify units, line management, and  other individuals having environmental duties and regulatory compliance responsibilities.

    c.   Includes ongoing means of communicating environmental issues and information among the various levels and functions of the organization, to include all persons working for or on behalf of the organization  (e.g., on-site service providers and contractors who function as *de facto* employees), and for receiving and addressing their concerns.

---

[4]   *The 12 elements are closely inter-related components of an EMS for which subsystems and procedures must be developed and fully integrated if the entire program is to be effective.  They are usually included in settlement agreements as a complete group; however, individual elements may need to be modified to reflect site-specific conditions and circumstances.*

3. **Accountability and Responsibility**

    a.    Specifies accountability and environmental responsibilities of organization's managers, and managers of other organizations acting on its behalf for environmental protection and risk reduction measures, assuring compliance, required reporting to regulatory agencies, and corrective actions implemented in their area(s) of responsibility.

    b.    Describes incentive programs for managers and employees to perform in accordance with compliance policies, standards, and procedures.

    c.    Describes potential consequences for departure from specified operating procedures, including liability for civil/administrative penalties imposed as a result of noncompliance.

4. **Environmental Requirements**

    a.    Describes process for identifying potentially applicable environmental requirements; interpreting their applicability to specific operations, emissions, and waste streams; and effectively communicating those applicable environmental requirements to affected persons working for or on behalf of the organization.

    b.    Describes a process for developing, implementing and maintaining ongoing internal compliance monitoring to ensure that facility activities conform to applicable environmental requirements. Compliance monitoring shall include inspections and measurements, as appropriate.

    c.    Describes procedures for prospectively identifying and obtaining information about changes and proposed changes in environmental requirements, and incorporating those changes into the EMS (i.e., regulatory "change management").

    d.    Describes a procedure for communicating with regulatory agencies regarding environmental requirements and regulatory compliance.

5. **Assessment, Prevention, and Control**

    a.    Identifies an ongoing process for assessing operations, for the purposes of preventing, controlling, or minimizing reasonably foreseeable releases, environmental process hazards, and risks of noncompliance with environmental requirements. This process shall include identifying operations and waste streams where equipment malfunctions and deterioration, and/or operator errors or deliberate malfeasance, are causing, or have the potential to cause: (1) unplanned or unauthorized releases of hazardous or harmful contaminants to the environment, (2) a threat to human health or the environment, or (3) noncompliance with environmental requirements.

    b.    Describes process for identifying operations and activities where documented operating criteria, such as standard operating procedures (SOPs), are needed to prevent noncompliance or unplanned/unauthorized releases of hazardous or harmful contaminants, and defines a uniform process for developing, approving and implementing the documented operating criteria.

    c.    Describes a system for conducting and documenting routine, objective, self-inspections by department supervisors and trained staff, especially at locations identified by the process described in (a) above, to check for malfunctions,

**Compliance-Focused Environmental Management System**
**Enforcement Agreement Guidance**

deterioration, worker adherence to operating criteria, unusual situations, and unauthorized or unplanned releases.

d.  Describes a "management of change" process to ensure identification and consideration of environmental requirements, the environmental aspects/impacts, and potential operator errors or deliberate malfeasance during planning, design, and operation of ongoing, new, and/or changing buildings, processes, equipment, maintenance activities, and products.

**6.   Environmental Incident and Non-compliance Investigations**

a.  Describes standard procedures and requirements for internal and external reporting of environmental incidents and noncompliance with environmental requirements.

b.  Establishes procedures for investigation, and prompt and appropriate correction of noncompliance. The investigation process includes root-cause analysis of identified problems to aid in developing the corrective actions.

c.  Describes a system for development, tracking, and effectiveness verification of corrective and preventative actions.

**7.   Environmental Training, Awareness, and Competence**

a.  Identifies specific education and training required for organization personnel or those acting on its behalf, as well as process for documenting training provided

b.  Describes program to ensure that organization employees or those acting on its behalf are aware of its environmental policies and procedures, environmental requirements, and their roles and responsibilities within the environmental management system.

c.  Describes program for ensuring that personnel responsible for meeting and maintaining compliance with environmental requirements are competent on the basis of appropriate education, training, and/or experience.

d.  Identifies training on how to recognize operations and waste streams where equipment malfunctions and deterioration, and/or operator errors or deliberate malfeasance, are causing, or have the potential to cause: (1) unplanned or unauthorized releases of hazardous or harmful contaminants to the environment, (2) a threat to human health or the environment, or (3) noncompliance with environmental requirements.

**8.   Environmental Planning and Organizational Decision-Making**

a.  Describes how environmental planning will be integrated into organizational decision-making, including plans and decisions on capital improvements, product and process design, training programs, and maintenance activities.

b.  Requires establishing, on an annual basis, written targets, objectives, and action plans for improving environmental performance, by at least each operating organizational subunit with environmental responsibilities, as appropriate, including those for contractor operations conducted at the facility, and how specified actions will be tracked and progress reported. Targets and objectives must include actions that reduce the risk of noncompliance with environmental requirements and minimize the

Compliance-Focused Environmental Management System
Enforcement Agreement Guidance

potential for unplanned or unauthorized releases of hazardous or harmful contaminants.

**9. Maintenance of Records and Documentation**

    a.    Identifies the types of records developed in support of the EMS (including audits and reviews), who maintains them and, where appropriate, security measures to prevent their unauthorized disclosure, and protocols for responding to inquiries and requests for release of information.

    b.    Specifies the data management systems for any internal waste tracking, environmental data, and hazardous waste determinations.

    c.    Specifies document control procedures.

**10. Pollution Prevention**

    a.    Describes an internal process or procedure for preventing, reducing, recycling, reusing, and minimizing waste and emissions, including incentives to encourage material substitutions. Also includes mechanisms for identifying candidate materials to be addressed by the pollution prevention program and tracking progress.

**11. Continuing Program Evaluation and Improvement**

    a.    Describes program for periodic (at least annually) evaluation of the EMS, which specifies a process for translating assessment results into EMS improvements. The program shall include communicating findings and action plans to affected organization employees or those acting on its behalf.

    b.    Describes a program for periodic audits (at least annually) of facility compliance with environmental requirements by an independent auditor(s). Audit results are reported to upper management and instances of noncompliance are addressed through the process described in element 6 above.

**12. Public Involvement/Community Outreach**

    a.    Describes a program for ongoing community education and involvement in the environmental aspects of the organization's operations and general environmental awareness.